In the
UNITED STATES DISTRICT COURT
for the SOUTHERN DISTRICT OF INDIANA,
INDIANAPOLIS DIVISION

| | |
|---|---|
| **JERRY A. BUNDY**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CAUSE NO. 1:09-cv-915-SEB-JMS |
| | ) |
| **MICHAEL J. ASTRUE**, Commissioner of | ) |
| Social Security, | ) |
| | ) |
| Defendant. | ) |

## **E N T R Y**

Plaintiff Jerry Bundy brought this action to obtain judicial review of the Defendant Commissioner of Social Security's decision denying his applications for disability benefits. For the reasons set forth herein, the Commissioner's decision is affirmed.

Judicial review of the Commissioner's factual findings is deferential: courts must affirm if the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004). This limited scope of judicial review follows the principle that Congress has designated the Commissioner,

1

not the courts, to make disability determinations:

> In reviewing the decision of the ALJ, we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). *Carradine*, 360 F.3d at 758. While review of the Commissioner's factual findings is deferential, review of his legal conclusions is *de novo*. *Richardson*, *supra*.

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. §§ 416(I) and 423(d)(1)(A). A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The combined effect of all of a claimant's impairments shall be considered throughout the disability determination process. 42 USC § 423(d)(2)(B).

The Social Security Administration ("SSA") has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. 20 C.F.R. § 404.1520. If disability status can be determined at any step in the sequence, an application will not be reviewed further. *Id.* At the first step, if the claimant is currently engaged in substantial gainful activity, then he is not disabled. At the second step, if the

claimant's impairments are not severe, then he is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Third, if the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then the claimant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the SSA has pre-determined are disabling. 20 C.F.R. § 404.1525. If the claimant's impairments do not satisfy a Listing, then his residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations. 20 C.F.R. § 404.1545. At the fourth step, if the claimant has the RFC to perform his past relevant work, then he is not disabled. Fifth, considering the claimant's age, work experience, and education (which are not considered at step four), and his RFC, he will not be determined to be disabled if he can perform any other work in the relevant economy.

The burden rests on the claimant to establish steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the claimant can perform in the national economy. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). If a claimant has only exertional limitations, the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"), may be used at step five to arrive at a disability determination. The grids are tables that correlate a claimant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled. 20 C.F.R. §§ 404.1569 and 1569a. If a claimant has non-exertional limitations or exertional limitations that restrict the full

3

range of employment opportunities at his RFC level, then the grids may not be used and a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the claimant's particular vocational and medical characteristics. *Id.*; *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993). The grids result, however, may still be used as an advisory guideline in such cases. 20 C.F.R. § 404.1569.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist. If the application is denied, the claimant may request reconsideration review, which is conducted by different disability and medical experts. If denied again, the claimant may request a hearing before an administrative law judge ("ALJ").[1] A claimant who is dissatisfied with the decision of the ALJ may request the national Appeals Council to review the decision. If the Appeals Council either declines to review or affirms the decision, then the claimant may file an action in district court for judicial review. 42 U.S.C. § 405(g). If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

Mr. Bundy applied for both DIB and SSI disability benefits on June 2, 2006, alleging an onset-of-disability date of December 11, 2005, which was the date he was last employed, and a disability due to impaired vision and limited education. After his claims were denied on initial

---

[1] Initial and reconsideration reviews in Indiana are performed by an agency of the state government — the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration — under arrangement with the Social Security Administration. 20 C.F.R. Part 404, Subpart Q (§ 404.1601 *et seq.*). Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal SSA.

and reconsideration reviews, he requested and received a hearing before an ALJ. An ophthalmologist testified at the hearing as a medical expert, as did a certified rehabilitation counselor as a vocational expert. At the first step, the ALJ found that Mr. Bundy was not engaged in substantial gainful activity.[2] At the second step, the ALJ found that Mr. Bundy had two severe impairments: Stargardt's macular dystrophy ("SMD")[3] and adjustment disorder with depressed features. He found that Mr. Bundy had not carried his burden of proving his alleged mild mental retardation or borderline intellectual functioning. At the third step, the ALJ found that these impairments, individually or in combination, do not meet or medically equal any of the listed impairments. He evaluated Mr. Bundy's SMD under Listings 2.02, 2.03, and 2.04. He evaluated the adjustment disorder under Listing 12.04.

For purposes of his steps four and five analyses, the ALJ determined Mr. Bundy's RFC. He evaluated the credibility of Mr. Bundy's allegations regarding his symptoms according to the symptoms protocol of 20 CFR §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The ALJ found that Mr. Bundy's impairments reasonably could be expected to produce the type of symptoms he alleged but also found that Mr. Bundy's allegations regarding the intensity, persistence, and limiting effects of his symptoms were not credible because they were

---

[2] Mr. Bundy was found to have insured status through December 31, 2010.

[3] "An inherited form of juvenile macular degeneration. There is a progressive loss of central vision, with preservation of peripheral vision." J. E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* at S-282 (2009). Macular degeneration is "[a] disease marked by pathologic (disease-indicating) changed in the macula lutea. The macula lutea is a small oval area near the center of the back surface of the retina . . . . It is the area of the retina giving the clearest vision. * * * It occurs bilaterally (in both eyes) and at any age, usually running in families. It is hereditary, and is progressive (proceeds to get worse)." *Id*. at —10.

5

inconsistent with the objective medical evidence, the medical opinion evidence, and his activities of daily living. The ALJ found that Mr. Bundy had the RFC to perform the full range of work at all exertional levels with the following non-exertional limitations: (1) avoid driving from dawn to dusk; (2) avoid work at unprotected height; (3) work only in a well-lit environment with at least standard lighting; (4) no highly visual work; (5) only simple, one- to two-step tasks; and (6) only simple work-related decisions.

At the fourth step, the ALJ found that Mr. Bundy was unable to perform his past relevant work as an automobile mechanic and an automobile cleaner because both required more than one or two steps. At the fifth step, the ALJ used the Grids as a guideline. Considering Mr. Bundy's RFC, age at his alleged onset date (38 years, categorized as a "younger individual"), work experience (found to be irrelevant at Mr. Bundy's RFC level), and education (completion of twelfth year but without diploma, categorized as "limited"), Grid rule 204.00 would direct a finding of not disabled. Because Mr. Bundy had non-exertional impairments, the ALJ obtained the opinion of a vocational expert who testified to the numbers of jobs existing in the economy for an individual with Mr. Bundy's profile. The ALJ concluded that Mr. Bundy had the capability to make a successful adjustment to other work that exists in significant numbers in the national economy and was, therefore, not disabled.

SSA's Appeals Council denied Mr. Bundy's request for review, thus rendering the ALJ's decision the final decision of the Commissioner on his applications and the one that we review. Mr. Bundy raised several arguments against the ALJ's decision.

**Medical equivalence.** Mr. Bundy's primary argument is that the ALJ erred in finding

that Mr. Bundy's SMD is not medically equivalent to the severity of any of the Listings, meaning at least equal in severity and duration to the criteria of any listed impairment. 20 CFR § 404.1526(a). Mr. Bundy argues that the ALJ failed to consider the issue of medical equivalence; the testifying medical expert, Dr. Taub, ophthalmologist, did not testify regarding medical equivalence; and the ALJ failed to follow proper SSA procedures in evaluating medical equivalence.

At step three, the ALJ considered whether Mr. Bundy's SMD satisfied the criteria of Listings 2.02 (loss of visual acuity), 2.03 (contraction of the visual field in the better eye), and 2.04 (loss of visual efficiency). These listings do not describe criteria for the existence of particular disease conditions or impairments; instead, they are geared only to symptom severity, regardless of the underlying impairment. Listings 2.02 and 2.03 describe certain diagnostic results showing loss of visual acuity or visual field that are required to satisfy the listings. Listing 2.04 requires a certain level of visual efficiency which is a mathematical calculation derived from a person's visual acuity efficiency rating and visual field efficiency rating. 20 CFR Part 404, Subpt. P, Appendix 1, Part A, § 2.00.A.7. At the hearing, the ALJ heard the testimony of Dr. Taub, an ophthalmologist, who reviewed the relevant test results that are present in the Record and gave his opinion that none of results satisfied the listing level of severity. Dr. Taub did not directly offer an opinion on medical equivalence.[4] Two state-agency medical experts

---

[4] The ALJ initially asked Dr. Taub whether Mr. Bundy's impairments, individually or in combination, "meet or equal any of those listings" and Dr. Taub answered, "They do not meet it," omitting the "equal" part of the question. (R. 89-90). The ALJ neglected to follow up. Subsequently, the ALJ asked what Dr. Taub's basis was for his opinion that Mr. Bundy did not "meet" Listing 2.02, (R. 90), and the basis for his opinion that Mr. Bundy did not "meet or equal" Listings 2.03, (*id*.), and 2.04, (R. 91). In all cases, Dr. Taub's answers did not distinguish

7

reviewed the records, including the same test results, and recorded their opinions that medical equivalence was not established. (R. 135-38). The ALJ specifically found that Mr. Bundy's impairments, individually or in combination, did not medically equal any of the listings. (R. 12).

Mr. Bundy does not disagree that the test results do not meet the listings criteria. Instead, he argues that the listing criteria are inapt: he contends that his SMD "has a quite different effect" than can be measured by the visual acuity and field criteria of listings 2.02, 2.03, and 2.04, (Response at 10), and "his [SMD] was a visual loss quite different from the listing visual impairments," (*id*. at 12). But he never explains how his SMD differs from other impairments that cause the losses in visual acuity, field, and/or efficiency that are covered by the three listings such that their criteria cannot adequately measure its severity for making a medical-equivalency determination. As described by Dr. Taub, SMD causes a loss in central-vision acuity, which is measured by the criteria of Listing 2.02 and 2.04. Dr. Smoylar conducted a consultative ophthalmological examination of Mr. Bundy and concluded that he had only moderate visual loss due to his SMD. The ALJ, Dr. Taub, and the agency physicians also considered the evidence of Mr. Bundy's activities of daily living that showed that those activities were not seriously limited. For example, the ALJ noted that he watches television, plays video games, drives a car without difficulty or assistance, has an unrestricted driver's license, and does household chores. Mr. Bundy has neither suggested nor shown why the listing criteria are inapplicable as a measure of the severity of his SMD or other diagnostic tests that would have been more appropriate, and he failed to present any other measure of his SMD's severity in order

---

between "meet" and "equal." It is unclear from this confused exchange whether Dr. Taub understood the significance of medical equivalence or gave an opinion on the issue.

to prove medical equivalence with the listing levels of severity.

The ALJ wrote that he found Mr. Bundy's impairments did not medically equal any of the Listings; that is sufficient to show that he considered the issue. Two agency physicians opined that there was no medical equivalence; that satisfied the ALJ's duty to obtain expert medical opinion on the issue. And Dr. Taub's opinion and the objective medical evidence in the Record showed that Mr. Bundy's SMD was not as severe as provided in the relevant visual Listings which is substantial evidence supporting the ALJ's decision on medical equivalence.

**Hypothetical questions.** Mr. Bundy argues that the vocational expert's testimony regarding the number of jobs in the national economy that he could perform is invalid because the ALJ failed to include in his hypotheticals Mr. Bundy's diagnosis of SMD or that he had impaired central vision. The ALJ's hypothetical included several limitations related to Mr. Bundy's visual impairment, including avoiding driving from dawn to dusk, avoiding work at unprotected heights; working only in a well-lit environment with at least standard lighting, and no highly visual work. Thus, the ALJ's hypothetical was phrased in terms of the functional limitations resulting from Mr. Bundy's SMD that he found to have been credible and supported by the evidence. Providing the vocational expert with a simple diagnosis of SMD would not have facilitated his testimony: not only was the vocational expert not a medical expert but the simple diagnosis alone, especially of a progressive impairment, would not have communicated the relevant functional limitations caused by the current status of the disorder. Mr. Bundy presented no authority requiring ALJs to provide medical diagnoses to vocational experts in order to render their opinions valid. We find no error in the ALJ's hypothetical to the vocational

9

expert.

**Controlling weight to treating physician.** Mr. Bundy faults the ALJ for failing to give controlling weight to the opinion of his personal treating physician, Dr. Wilson, that Mr. Bundy is totally disabled. Dr. Wilson wrote to Mr. Bundy's attorney after a May 2008 annual eye examination: "In my opinion [Mr. Bundy] should be given full disability benefits. He is unable to work currently and will not be able to work in the future." (R. 298). In this letter, Dr. Wilson included the following: (1) Mr. Bundy's distance and near visual acuity ratings (which did not meet the listings criteria); (2) the fact that Mr. Bundy had been diagnosed with SMD two years prior; (3) Mr. Bundy was beginning to show a right-side peripheral-field defect in both eyes; and (4) that SMD is progressive and Mr. Bundy's will more than likely continue to deteriorate over the next five to ten years. Despite Dr. Wilson's status as Mr. Bundy's treating physician, this opinion that Mr. Bundy is unable to work and is due full disability benefits is not entitled to controlling weight because it provides no explanation of the basis for the opinion and does not provide the supporting evidence. Further, the issue of whether Mr. Bundy is disabled under the governing standards of the Social Security Act and is due benefits is a decision reserved to the Commissioner. The ALJ correctly did not give Dr. Wilson's opinion controlling weight. In light of Dr. Wilson's opinion's conflict with the opinions of Dr. Taub, Dr. Smoylar, and the agency's two reviewing experts, substantial evidence also supports the ALJ's assigning it little weight.

**Outdated data.** Mr. Bundy argues that Dr. Taub, the medical expert testifying at the hearing, could not have given a valid opinion regarding the current status of his SMD because the data provided by the ALJ was old and SMD is progressive disorder. Mr. Bundy alleged an

10

onset date of December 2005; Dr. Wilson's opinion letter included visual-acuity test results from a May 2008 examination, and the hearing occurred in August 2008. When testifying about Mr. Bundy's peripheral vision, Dr. Taub used the results of a visual field test conducted in July 2006. He noted that, while Dr. Wilson's opinion letter included the visual-acuity test results from his May 2008 examination, he omitted the visual field or peripheral test results (but opined that Mr. Bundy was "beginning to show a defect to his right side in both eyes"). When asked if he would prefer to have more recent visual-field test results, Dr. Taub responded that they would have been helpful. (R. 98). Thus, Mr. Bundy's assertion of "old data" does not implicate Dr. Taub's testimony or opinion regarding the quality of Mr. Bundy's visual acuity. Because Mr. Bundy has not asserted or alleged that he is disabled because of a decreased visual field, the practical effect of Dr. Taub relying on 2006 visual-field test results on Mr. Bundy's claim for benefits is obscure. Further, Mr. Bundy does not identify any more recent test results that were available and does not argue that the ALJ erred by not obtaining a visual-field examination. Regardless, it was Mr. Bundy's burden to submit the objective medical evidence proving that his deteriorated visual field either medically equaled the listing or was disabling. He attempted neither. Mr. Bundy has not shown error.

**Incomplete vocational-expert testimony.** After the hearing, the ALJ sent Mr. Bundy for a consultative mental examination. Mr. Bundy argues that the ALJ erred by not holding a supplemental hearing after the examiner's report, (R. 309), was submitted, recalling the vocational expert to testify, informing him of the report's findings and opinions, and soliciting an updated vocational opinion. He cited no authority, however, requiring that a vocational expert be provided with the contents of a mental examination. After the ALJ reviewed the report, he

11

credited the examiner's opinion that Mr. Bundy has moderate difficulties with concentration, persistence, and pace and that his memory and comprehension were affected by depressive symptoms secondary to worsening eyesight. He also credited the examiner's opinion that Mr. Bundy would have marked difficulty understanding, remembering, and carrying out detailed instructions. (R. 13). The ALJ accounted for these opinions by limiting Mr. Bundy's RFC to work that requires one- to two-step tasks. (R. 13, 16). He found that Mr. Bundy's mental impairment did not meet or medically equal Listing 12.04, and Mr. Bundy does not challenge that finding. After reviewing and discussing the entire report, (R. 13-14), the ALJ found that it supported the restrictions to one- to two-step tasks and simple work-related decisions. (R. 14, 16). Because the ALJ had already included the restriction to one- to two-step tasks in his hypotheticals to the vocational expert, (R. 117-18), there was no reason to obtain a supplemental opinion from him following the mental-status examination. There was also no need to provide the vocational expert with the details of the mental-status report or the examiner's opinions.

## Conclusion

Because Mr. Bundy has failed to show that the Commissioner's factual findings are unsupported by substantial evidence or that his decision is compromised by legal error, the Court **AFFIRMS** the Commissioner's decision.

**SO ORDERED.**

Date: 09/22/2010

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Thomas E. Williams
teqw@aol.com